Ethan J. Brown (SBN 218814)
 *ethan@bnsklaw.com*
Jill R. Glennon (SBN 204506)
 *jill@bnsklaw.com*
BROWN NERI SMITH & KHAN LLP
11601 Wilshire Boulevard, Suite 2080
Los Angeles, California 90025
Telephone:  (310) 593-9890
Facsimile:   (310) 593-9980

*Attorneys for Plaintiff*
Luma Pictures, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| LUMA PICTURES, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN BETUEL, an individual,<br><br>Defendant. | CASE NO. 2:16-cv-02625-GW(PLAx)<br><br>[Hon. George H. Wu]<br><br>**LUMA PICTURES, INC.'S ARGUMENT IN OPPOSITION TO THE COURT'S TENTATIVE POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................ 1

II. KEY EVIDENCE ADMITTED AT TRIAL ............................................... 5

    A. The Eight Categories of Evidence Omitted from the Tentative. ....... 5

        1. Mr. Shohadai's Testimony Regarding his Discussions with Mr. Betuel when Luma was Formed ........................................... 5

        2. Mr. Shohadai and Mr. Betuel Agreed that Luma's Long-Term Goal was to Become a Producer of Original Content ........................ 7

        3. Mr. Betuel's Role as Co-Founder and Co-Owner of Luma ................ 8

        4. Mr. Betuel's Open and Notorious Use of Luma's Resources ............. 9

        5. The Evidence that Mr. Betuel Made Representations to Mr. Shohadai Throughout his Employment that Luma Would Benefit from Production Deals for the Scripts ................................ 11

        6. The Evidence that Luma's Other Employees Understood that Writing the Scripts was Part of Mr. Betuel's Duties ......................... 11

        7. The Evidence that Mr. Betuel's Industry Contacts Understood Luma Would be Part of any Production Deal for the Scripts .......... 12

        8. The Evidence that Mr. Betuel Lied About his Work on the Scripts in Order to Advance his Legal Arguments in this Case .................... 12

    B. The Indefinitely Copyright and Project Lightning Presentation .... 13

III. CONCLUSION .......................................................................................... 15

## I. INTRODUCTION

Pursuant to this Court's order at the hearing regarding its Tentative Post-Trial Findings of Fact and Conclusions of Law (the "Tentative"), Plaintiff Luma Pictures, Inc. ("Luma") hereby provides evidence and argument in support of its position that the Tentative reached an erroneous conclusion of fact on the first criteria of the scope of employment test – a conclusion that disposed of Luma's claim that certain scripts and other copyrightable works (the "Scripts"), which were written by Mr. Betuel during his employment, are "works made for hire" under the Copyright Act. Luma argues the Tentative is wrong because it reached the conclusion that Mr. Betuel was not hired to write the Scripts without reflecting the Court's consideration of the following eight categories of evidence, which demonstrate the existence of an oral or implied in fact agreement that writing the Scripts was part of Mr. Betuel's job:

1. Mr. Shohadai's testimony that – in exchange for shares and a job at Luma - Mr. Betuel represented that he would contribute his writing to Luma.

2. The evidence that Mr. Betuel agreed with Mr. Shohadai that Luma's long-term goal was to become a producer of original content.

3. The evidence that Mr. Betuel's role at Luma was broader than sales. He was a co-founder, co-owner, officer and director of Luma and was considered senior management.

4. The evidence that Luma did not object to Mr. Betuel's open and notorious use of Luma's time and resources to write the Scripts and negotiate production deals for them.

5. The evidence that Mr. Betuel repeatedly represented to Mr. Shohadai that Luma would benefit from the deals he was negotiating.

6. The evidence that Luma employees understood that writing the Scripts was part of Mr. Betuel's job.

    7. The evidence that Mr. Betuel's industry contacts understood that Luma would be part of any deal for the production of works based on the Scripts.

    8. The evidence that Mr. Betuel lied throughout the litigation when he believed it would benefit his case.

Luma respectfully submits that the first four categories of evidence would be sufficient under a preponderance standard to establish the existence of an oral or implied in fact agreement that writing the Scripts was part of Mr. Betuel's job. When the fifth, sixth, seventh and eighth categories are added to the analysis, the evidence of an agreement is too compelling to dismiss. Any conclusion regarding the first criteria of the scope of employment test would be incomplete without considering Mr. Shohadai's testimony about his conversations with Mr. Betuel (which took place when Luma was formed and throughout Mr. Betuel's employment) as well as the evidence that both Luma and Mr. Betuel performed in accordance with the understanding that writing the Scripts was the type of work Mr. Betuel was employed to do.

    Luma further submits that when the two pieces of documentary evidence the Court relied upon to reach its tentative conclusion are reconsidered with the context provided herein, the Court should find that the Tentative did not take full account of critical facts regarding the value of the Scripts to Luma. As a practical matter, the only way to monetize the Scripts was to produce them in a format that could be sold and distributed. Luma could recognize that value by performing the visual effects work and taking its cut off the front end of the deal (costs of production). Luma could also recognize their value by taking a cut off the back end of the deal (profits). The back end carries with it a certain amount of risk and, because there are no profits unless a movie is actually made, the party or parties that finance the production have the greatest say as to how the front and back ends will be carved up. That does not mean ownership of the copyrights had no value to

Luma if it did not intend to finance and produce works based on the copyrights by itself. The copyright was one bargaining chip that Luma could use to negotiate its cut of the pie. If that cut included a large visual effect contract (worth tens of millions of dollars according to Mr. Betuel) and credit as an executive producer, Luma would recoup considerable value from its investment in the creation of the Scripts and advance its long-term goal of becoming a producer of original content.

The Court cited the *Indefinitely* copyright and Project Lightning presentation in support its preliminary conclusion that Mr. Shohadai did not believe Luma owned the copyrights to the Scripts. As a preliminary matter, none of the authorities cited by Luma or Mr. Betuel consider the parties' subjective beliefs as part of the scope of employment analysis. Moreover, Mr. Shohadai's subjective beliefs regarding ownership of the copyright are of dubious relevance where there was no evidence that Mr. Shohadai understood the legal criteria for determining whether a work is "made for hire" under Section 101(1) of the Copyright Act. The testimony at trial was that Mr. Shohadai viewed Luma's rights to the Scripts as a business man would. Mr. Betuel agreed that his work on the Scripts would be to Luma's benefit. Luma provided Mr. Betuel with the resources to create and promote those Scripts. On those facts, which are part of the criteria for the scope of employment test, Mr. Shohadai believed Luma was entitled to the "upside" from any deal that would monetize the value of the copyrights for the Scripts.

The Tentative did not consider these realities when it reasoned that "either Luma negotiated its way entirely out of the [*Indefinitely*] copyright or the copyright was never part of any negotiations because it was assumed by all sides that the authors – Shohadai and Cirelli – would own the copyright." Tentative, p. 13. But the court's finding does not follow the money. Although Mr. Shohadai and Mr. Cirelli received credit as "authors" and owners of the copyright, the rights associated with monetizing the copyright's value and the production credits were

carved up as part of a separate deal that does not appear on the face of the copyright registration. Mr. Betuel testified he protected Luma's rights in that deal and Mr. Cirelli testified Luma would receive a percentage from the film and was "high on the waterfall" – meaning Luma took its share before other parties to the deal.

The Tentative also failed to consider the full context of production deals Mr. Betuel was negotiating for the Scripts when it analyzed the Project Lightning presentation. The Tentative found that "if Luma owned the rights to [the Scripts], each would have represented a revenue stream beyond the fact that Luma was 'placed in first position' or a 'favorite' to secure the VFX work associated with each." *Id*. But according to the evidence admitted at trial, when the Project Lightning presentation was prepared (in 2014) Luma did not have the capability to produce films based on the Scripts by itself. The Scripts were for blockbusters that were above Luma's "punching weight." Because any film based on the Scripts would be financed and produced by third parties, the visual effects work was the most likely means by which Luma could recognize the monetized value of the copyrights and the Scripts were appropriately included in that section of the presentation even though the VFX revenues were contingent on the final terms of the deals and Luma could receive additional benefits including production credit.

Mr. Betuel's reference to the Scripts as "film properties I own" in an email he sent to Duff & Phelps about the Project Lightning presentation must also be considered in context. The Tentative found this evidence compelling, noting that Mr. Shohadai was copied on the email, yet "remained silent as the information was incorporated into a slide presentation that was provided to potential investors in Luma." Tentative p. 14. However, Mr. Betuel, who first refers to the Scripts in that same email as "Luma 'IP'[,]" is a co-owner of Luma with an interest in all of

its assets.  In light of those facts, there was no reason for Mr. Shohadai to object to Mr. Betuel's statements.

Luma hereby requests that the Court reconsider its tentative conclusions in light of the evidence discussed above and detailed below to find in Luma's favor on the first criteria of the scope of employment test.  Luma further requests that the Court review Luma's arguments in its Trial Brief [Dkt. 102] and Closing Brief [Dkt. 134] to find that the remaining two criteria of the scope of employment test have been proven by a preponderance of the evidence and award judgment in Luma's favor on its claim for declaratory relief.

## II. KEY EVIDENCE ADMITTED AT TRIAL

### A. The Eight Categories of Evidence Omitted from the Tentative.

1. <u>Mr. Shohadai's Testimony Regarding his Discussions with Mr. Betuel when Luma was Formed.</u>

During the trial, Mr. Shohadai testified regarding the discussions he had with Mr. Betuel in the early weeks of forming the Luma.  04/26 Vol I (PS) 30:13-31:12. Mr. Shohadai was expressly asked, "[D]id Mr. Betuel make any representations to you about what he would contribute to Luma Pictures in exchange for the shares?" *Id*.  Mr. Shohadai responded:

> "Yes.  So, the plan was that we would split our financial burdens 50-50.  Like we would all – we would both come in on all financial burdens.  He was going to bring in all visual effects works into the company.  That alone is not enough for somebody to end up owning a third of the company.
>
> But also his ancillary values as somebody who has been a writer, director, he often spoke about – and you will see in the e-mails where he talks about a film that he is writing or has written is going to go any

|  |  |
|---|---|
| 1 | day now – you have probably seen e-mails like this – and how that is |
| 2 | going to benefit Luma, and Luma will be a producer and all that." |

*Id*.

Although Mr. Shohadai testified that he and Mr. Betuel reached a verbal agreement in 2002 regarding the shares Mr. Betuel would receive in exchange for his contributions to Luma, the shares were not formally issued until 2004. By that time, Mr. Shohadai had begun questioning whether Mr. Betuel was bringing in the value he promised. Originally, Mr. Shohadai agreed that Mr. Betuel would receive 50% of the shares. 4/26 Vol. II (JB) 77:8-16. In 2004, after Mr. Betuel failed to live up to his promise to cover 50% of Luma's financial burdens, Mr. Shohadai had another conversation with Mr. Betuel about the value he was contributing to the company. *Id*.; 04/26 Vol. I (PS) 44:3-45:5. Mr. Shohadai testified:

> "[D]espite the fact that it was already apparent to me that John wasn't living up to the majority of the obligations that we had agreed to get his shares, I felt like I am obligated to give him those shares.
> And he kept vowing up until that point and specifically at that point that, you know, he will pull in – he will definitely put in his portion of money when it is necessary and he will bring in jobs and work. And all along there is the conversation about the films that he is working on turning into something for Luma.
> Q. The films he is working on, are you referring to films for which he wrote scripts?
> A. Yeah."

*Id*. As a result of those discussions, Mr. Betuel received 31 1/3 of Luma's outstanding shares. Trial Ex. 9.

During the January 8, 2018 hearing, the Court asked whether a subsequent agreement in 2010 released Luma's rights in and to the Scripts. That agreement,

"The 2010 Stock Repurchase Agreement," provided that a dispute had arisen between Luma and Mr. Betuel "concerning his proper level of compensation." Trial Ex. 5. To resolve the dispute, Mr. Betuel agreed to sell Luma 14 1/3 of his shares in the Company in exchange for an increase in salary. *Id*. The agreement makes no reference to the scope of Mr. Betuel's employment duties or to the Scripts. *Id*. Further, there was no release of any rights Luma had in and to the Scripts because (1) the only release of claims in that agreement was by Mr. Betuel (*see* ¶¶7 and 8) and (2) if the Scripts are works made for hire then ownership vested in Luma upon their creation and could only be transferred by an express written agreement. *See* 17 U.S.C. §201(b) and legislative comments thereto.

### 2. Mr. Shohadai and Mr. Betuel Agreed that Luma's Long-Term Goal was to Become a Producer of Original Content.

The Tentative appears to discount the evidence regarding Luma's long-term goal to become a producer of original content by making three findings of fact. First, the Tentative characterizes that goal as *Mr. Shohadai's* vision for Luma. Second, the Tentative notes that, in the beginning, "original content *creation*" was a dream and not a reality. Third, the Tentative found that "the evidence does not show that Shohadai and Betuel ever agreed on what Betuel's role at Luma might become if those dreams ever materialized." Tentative p. 12.

With respect to the first finding of fact, the Tentative fails to consider Mr. Shohadai's testimony that he discussed his long-term goal of producing original content with Mr. Betuel when they formed the company and that Mr. Betuel agreed with that goal. 04/26 Vol I (PS) 31:13-16; 35:5-18. Mr. Betuel continued to express his support for Luma's long-term goal, as evidenced by his consent to Luma's investment in the *Indefinitely* project and the fact that he stood by while Mr. Shohadai adopted the goal as Luma's "mission statement" and discussed Luma's growth initiatives with potential investors. 04/26 Vol I (PS) 68:3-18, 69:5-

13, 100:17-101:15; 05/02 Vol I (JB) 21:5-26:9; Ex. 13 at LP025106; Ex. 334 at LP010217.

As to the second finding on this issue, the Tentative erroneously equates Luma's long term goal of becoming a *producer* of original content (Trial Ex. 13) with Mr. Betuel's efforts to *write* original content. For the entire time that Mr. Betuel was employed by Luma, Mr. Betuel had the ability and authority to write the Scripts and negotiate production deals for them.  4/26 Vol. I (PS) 77:11-25; 96:24-97:3.  If Mr. Betuel had succeeded in closing any one of those deals, Luma would have benefitted financially from the promised VFX work and Luma's long-term goal would have been advanced by the executive producer credit Mr. Betuel repeatedly dangled in front of Mr. Shohadai. 4/28 Vol II (JB) 138:23-139:4. Those benefits were not dependent on Luma's ability or desire to finance or produce works based on the Scripts by itself.

As to the Tentative's third finding that Mr. Betuel's role was never defined with respect to Luma's long term goal, Luma submits that the evidence proves the parties agreed Mr. Betuel would write the Scripts and negotiate production deals for them.  That agreement is evidenced by Mr. Shohadai's testimony about his oral conversations with Mr. Betuel and from the course of conduct of the parties.

### 3. Mr. Betuel's Role as Co-Founder and Co-Owner of Luma.

Mr. Betuel did not consider himself to be a mere salesman for Luma.  He used the title, "Co-Founder" and was considered part of Luma's senior management team.  Ex 334 at LP010237; 4/26 Vol I (PS) 75:14-22; 4/26 Vol II (JB) 86:18-20, 92:21-23.  Mr. Betuel testified that when Luma was in its start-up phase he did whatever was needed to get Luma's business off the ground.  4/26 Vol. II (JB) 77:8-16.  In 2015, Mr. Betuel took credit for "building" Luma Pictures along with his "partner," during an email conversation with Phil Groves of IMAX.

Ex. 234. Mr. Betuel mused, "as you know from running a company yourself – such an endeavor is all encompassing in scope and demands." *Id*.

And at trial, Mr. Betuel testified:

> "Wherever I go, whatever meetings I had, Luma was involved. That was implied. I had been doing it for 15 years. What would I keep to myself? Luma was my company."

05/02 Vol I (JB) 16:3-10.

Mr. Betuel continued: "If that meant I would write a treatment and break the logjam for everybody and deliver a package of $85 million when I had a capacity of doing what I did at my company, when no one else could do that or attract the kind of interest, I would certainly do that."

*Id*. 16:11-16.

### 4. Mr. Betuel's Open and Notorious Use of Luma's Resources.

The evidence that both Luma and Mr. Betuel performed in accordance with the understanding that Mr. Betuel's job included writing and negotiating production deals for the Scripts is extremely compelling evidence of an oral or implied in fact agreement that script-writing was part of his job. Luma's performance is evidenced by Mr. Shohadai's consent to Mr. Betuel's open and notorious use of Luma's assets to write the Scripts and negotiate production deals for them. As Mr. Shohadai testified, if writing the Scripts was not part of his job, then he would have told him to get back to work. 04/26 Vol II (PS) 28:6-30:23.

Although at trial Mr. Betuel downplayed how much time he spent writing the Scripts during regular business hours, he did admit to writing the Scripts at work. 04/28 Vol II (JB) 145:7-148:6, 152:12-25; *see also e.g.*, Exs. 111, 118-123, 136, 149, 150, 156, 161. His work on the Scripts did not escape the attention of his co-workers. 04/28 Vol II (VC) 11:13-23 ("he was writing a good amount of the

time."), 39:10-40:5; 04/28 Vol II (EW) 111:23-113:6. Mr. Cirelli, Vice President and Visual Effect Supervisor, and Mr. Wischik, Luma's former financial manager, both testified they saw Mr. Betuel writing in his office and observed stacks of scripts on Mr. Betuel's desk. 04/28 Vol II (VC) 48:7-10, 49:14-51:6; 04/28 Vol II (EW) 111:23-113:6. They explained that they knew the documents were scripts because they followed a standard format and had brass tacks along the edge, which are characteristics of scripts. 04/28 Vol II (VC) 48:7-10, 84:25-87:16; 04/28 Vol II (EW) 111:23-113:6. Luma even admitted some of those original documents into evidence with their brass tacks still in place. Exs. 400-405, 407-415, 419-420. Mr. Cirelli also testified Mr. Betuel's print jobs would back up the shared printer in the hallway outside his office, where Mr. Cirelli observed the documents were lengthy scripts. 04/28 Vol II (VC) 45:9-47:22.

In addition to writing, Mr. Betuel spent a great deal of time during his employment corresponding and meeting with his industry contacts to develop motion pictures based on the Scripts.[1] 04/26 Vol I (PS) 56:8-57:20; 04/28 Vol II (VC) 91:1-92:12; 04/28 Vol II (JB) 149:16-150:2. Most of those meetings took place during regular business hours and many of them occurred at Luma. 04/28 Vol II (VC) 38:11-42:11; 04/28 Vol II (EW) 114:2-13; 05/02 Vol I (JB) 18:19-19:15 (admitting the meetings took place "in and amongst my other Luma time schedules and duties."). Mr. Betuel also used his Luma credit card to expense meetings with many of the same people at restaurants around town. 04/25 (RE) 13:24-14:13, 17:22-18:6, 20:11-25:19; 05/02 Vol I (JB) 6:23-7:11; Ex 14, beginning p. 12 (identifying charges related to J. Schwartz, Phil Groves, Don Murphy, Lee Caplin, Doug Juhn, George Paige, Seth Willenson and Brian

---

[1] *See* Luma's Closing Brief [Dkt. 134], p. 6, n. 3, which details the evidence that 20% of the emails Mr. Betuel sent and received using his Luma email pertained to the Scripts.

Kavanaugh Jones); Ex. 4 (Response to Rogs 3 and 4 identifying the same individuals as persons he met with regarding the Scripts).

### 5. The Evidence that Mr. Betuel Made Representations to Mr. Shohadai Throughout his Employment that Luma Would Benefit from Production Deals for the Scripts.

Throughout his employment, Mr. Betuel continued to make representations to Mr. Shohadai that Luma would benefit from the Scripts and that he was close to reaching an agreement that would benefit Luma through large visual effects contracts (valued in the tens of millions of dollars) and by giving Luma production credit that "would have jumpstarted a lot of aspects" of content production. 04/26 (PS) 45:24-46:7, 54:7-56:7, 83:19-84:7, 85:13-6; 04/28 Vol II (JB) 137:12-19, 138:7-11, 138:23-139:4 (explaining the value of executive producer and second unit director credit), 140:1-6; Exs. 207, 226, 227, 229, 230, 252, 334 at LP010232 (the VFX budget for the Last Starfighter was estimated at $10-14 million, which would have been Luma's largest project at the time).

Mr. Shohadai's faith in Mr. Betuel's ability to negotiate and close production deals based on the Scripts rose and fell over time. 04/26 Vol. I 45:10-47:11 ("every now and then he will show a letter, like, let's say, Warner Brothers or maybe Relativity that shows interest. So my hope increases at that moment.") Mr. Shohadai testified, "it almost became a running joke that 'this time it is real or else dinner is on me.'" *Id*. 46:3-7; Ex. 207.

### 6. The Evidence that Luma's Other Employees Understood that Writing the Scripts was Part of Mr. Betuel's Duties.

Mr. Shohadai characterized Mr. Betuel as Luma's "resident expert filmmaker." 04/26 Vol I (PS) 55:19-56:7. Mr. Cirelli shared that view. 04/28 Vol II (VC) 4:12-13, 11:7-12 ("we viewed him as the film maker at the company that was going to move us into some form of production."). Mr. Cirelli testified "I

don't know what else John did at the company aside from writing scripts and taking meeting for the scripts and that sort of thing." *Id*. 39:10-13.  Mr. Wischik testified that apart from a few small visual effects projects that Mr. Betuel brought in, Mr. Betuel was in his office, "typing away."  04/28 Vol. II (EW) 108:19-20, 111:16-114:13 (Mr. Wischik also testified Mr. Betuel frequently met with people at Luma that were not related to the production of visual effects).

### 7. The Evidence that Mr. Betuel's Industry Contacts Understood Luma Would be Part of any Production Deal for the Scripts.

As further support for Luma's contention that Mr. Betuel was acting under the cloak of his authority as a co-founder and co-owner of Luma when he negotiated production deals for the Scripts, Mr. Betuel's industry contacts understood that Luma would be part of any deal that was struck. Ex. 147 ("Per our conversation here's Jon's Gizmo script for you, James, Jon & I to produce together through our companies.  Jon's company, Luma, of course will create studio level CG effects to make Gizmo a huge 'indie' picture.").  It is also clear from the emails that Mr. Betuel's contacts had the idea that Luma would provide its VFX services at a lower cost, which is something Luma would not do if it did not have an equity stake or some other upside in the production. 04/26 Vol I (PS) 86:7-87:17; 04/28 Vol II (VC) 38:17-24; Ex. 216 ("If not for you being a co-founder of Luma, I would say this picture would be too expensive to produce … but, you are and that's your advantage.").

### 8. Mr. Betuel Lied About his Work on the Scripts in Order to Advance his Legal Arguments in this Case.

The Tentative references the problems with Mr. Betuel's credibility in connection with its finding that Mr. Betuel wrote the Scripts during his employment from 2002 to 2015.  Tentative p. 5.  Those credibility issues apply with equal weight to Mr. Betuel's testimony regarding the scope of his

employment duties and – with the exception of the two pieces of documentary evidence cited by the Court (discussed *infra*, pp. 14-15) – Mr. Betuel's testimony is the only evidence contradicting the seven categories of evidence outlined above.

In particular, Mr. Betuel lied during his deposition when he testified that he did not write the Scripts at Luma's offices. 04/28 Vol. I (JB) 26:25-30:5. He claimed he wrote the Scripts after hours or on weekends and testified he never met with anyone regarding the Scripts at Luma's offices. *Id.* 30:7-32:15 (he also claimed he didn't send emails regarding the Scripts from his office computer). At trial, Mr. Betuel grudgingly admitted his deposition testimony was not true, but only after Luma confronted him with evidence he could not deny.

Mr. Betuel's shifting stories and blatant discovery misconduct is detailed extensively in Luma's Closing Brief [Dkt. 134] at n. 3 and pp. 15-17. In light of this evidence, Luma respectfully submits Mr. Betuel's testimony that his job was limited to sales (4/26 Vol. II (JB) 76:22-77:4) carries little to no weight against the testimony of Mr. Shohadai, Mr. Cirelli and Mr. Wischik, which is corroborated by contemporaneous documents and the entire course of conduct between Luma and Mr. Betuel.

**B. The Indefinitely Copyright and Project Lightning Presentation.**

As discussed above, the Tentative's findings regarding the *Indefinitely* copyright and Project Lighting presentation do not evidence the Court's consideration of the fact that copyrights have no monetary value unless and until they are used to create a product or published work that can be distributed for sale. *See Dumas v. Gommerman*, 865 F.2d 1093, 1097-98 (9th Cir. 1989) (recognizing that it is impossible to determine a work's value until it has been exploited). With respect to production deals for motion pictures or television programs, that monetized value must often be shared between many different parties. *See, e.g.*, Ex. 66 (Email from Mr. Betuel explaining typical production deals). Mr. Shohadai

testified that he understood the benefit to Luma from the Scripts would depend on the deal that was struck.  04/26 Vol I (PS) 45:10-47:11. If Luma was not going to put in the money to produce the film, then the party or parties that did invest would be in a position to dictate the terms of the deal.  4/26 Vol. II (PS) 36:19-39:25.

     For the *Indefinitely* project, which was Luma's first attempt to finance and produce a film in house, Luma hired an attorney to document the deal and brought Mr. Betuel in to represent Luma's interests in the negotiation between Mr. Shohadai and Mr. Cirelli on the one hand and Luma on the other.  05/02 Vol I (JB) 21:5-26:9, 04/26 Vol I (PS) 68:3-18, 69:5-13, 100:17-101:15; 04/28 Vol II (VC) 21:21-22:15, 23:7-13, 33:14-36:15; Exs. 61, 66, 68.  As a result of that process, Mr. Shohadai and Mr. Cirelli were listed as the "authors" on the copyright registration and Piphany Pictures, the production company formed to produce *Indefinitely*, was listed as the entity with "rights and permissions" for the copyrighted work.  04/28 Vol II (VC) 26:24-27:7, 29:17-33:12.  Mr. Cirelli testified the parties agreed that Luma would receive a percentage of the film and was high on the "waterfall."  4/28 Vol. II (VC) 101:7-103:12.  Mr. Betuel also testified he represented Luma's interests in the deal and ensured that Mr. Shohadai and Mr. Cirelli did not take a cut at Luma's expense.  05/02 Vol I (JB) 21:5-26:9. That deal, which carved up the monetized value of the *Indefinitely* copyright, is not reflected on the face of the copyright registration.

     For the Project Lightning presentation, the same considerations apply to the fact that the Scripts were referenced in Luma's pipeline of visual effects work.  At that time, Luma did not envision funding the production of films based on the Scripts or handling the production itself.  4/26 Vol. II (PS) 36:19-39:25 32:13-33:17 (the content Mr. Betuel was writing was beyond Luma's "punching weight" – it was big budget).  Accordingly, the most logical place to reference the Scripts was in the section describing Luma's expected VFX revenues.  Ex. 334 at

LP010232 (describing the production deals Mr. Betuel was negotiating and the VFX work expected to be allocated to Luma). The Scripts were included in the presentation after Mr. Betuel wrote an email to Duff & Phelps, describing the deals he was working on. Ex. 165 at LP009331. In that email, Mr. Betuel referred to several of the Scripts both as "Luma 'IP'" and "properties I own." Those statements are not in conflict because Mr. Betuel owned a substantial share of Luma.

Considering the fact that the subjective understandings of the employee and employer are not part of the criteria examined by Courts when determining scope of employment and in light of the context provided by all the evidence set forth above, Luma respectfully submits the Tentative erroneously considered the *Indefinitely* copyright and Project Lightning presentation to be evidence supporting its conclusion that writing the Scripts was not within the Scope of Mr. Betuel's employment.

## III. CONCLUSION

Under the preponderance of evidence standard, the evidence set forth above proves that writing the Scripts was the type of work Mr. Betuel was employed to do. Luma requests the Court reconsider its Tentative and find in Luma's favor with respect to each criteria of the scope of employment test, which would entitle Luma to judgment in its favor on its claim for declaratory relief.

Dated: January 11, 2018

Respectfully Submitted,
**BROWN NERI SMITH & KHAN, LLP**

By: /s/ Jill R. Glennon
     Jill R. Glennon

# **CERTIFICATE OF SERVICE**

I, Rowennakete P. Barnes, hereby declare under penalty of perjury as follows:

I am an attorney at the law firm of Brown Neri Smith & Khan, LLP, with offices at 11601 Wilshire Boulevard, Suite 2080, Los Angeles, California 90025. On the date below, I caused the foregoing **LUMA PICTURES, INC.'S ARGUMENT IN OPPOSITION TO THE COURT'S TENTATIVE POSTTRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW** to be electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on January 11, 2018.


/s/ Rowennakete P. Barnes